FILED
JEANNE A. NAUGHTON, CLERK
NOV 19 2019
U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY_____DEPUTY

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| In Re: | Case No.: | 18-28111-ABA |
|---|---|---|
| Michael Hopkins, | Chapter: | 13 |
| Debtor. | Judge: | Andrew B. Altenburg, Jr. |

## MEMORANDUM DECISION

Before the court is the issue of how it should respond to the debtor's having proceeded to closing on a sale of property without prior court approval, and failing to advise the chapter 13 trustee of the sale, and failing to immediately turn over the proceeds of the sale to the chapter 13 trustee and using a portion of the funds for personal unauthorized use,[1] as well as, the numerous errors committed by his attorney throughout this case. After a plenary hearing held October 9, 2019, the court concluded that the debtor acted in bad faith and abused the bankruptcy process. Then, both the debtor and his attorney were warned by the court that sanctions would be imposed for their behavior. The matter was taken under advisement to determine the appropriate remedy, with both the trustee and the debtor allowed to submit arguments on what action might be taken. Those submissions having been filed, the matter is now ripe for decision.

Pursuant to Fed. R. Bankr. P. 7052, the court issues the following findings of fact and conclusions of law.

## JURISDICTION AND VENUE

This matter before the court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O), and the court has jurisdiction pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a) and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984, as amended on September 18, 2012, referring all bankruptcy cases to the bankruptcy court. The following constitutes this court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

---

[1] The HUD-1 filed, Doc. No. 95, reflects that gross sale proceeds were $32,058.35 with net proceeds to the debtor in the amount of $19,172.22. Yet, only $11,400 was turned over to the chapter 13 trustee.

## FINDINGS OF FACT

The debtor, Michael Hopkins, filed this chapter 13 bankruptcy case on September 10, 2018. Doc. No. 1. He had one prior case dismissed within the prior year, thus he filed a Motion to Extend the Automatic Stay, which was granted October 9, 2018. *See* docket entry at September 1, 2018, Doc. Nos. 8, 16.

On September 17, 2018, the trustee filed an objection to the Chapter 13 Disclosure of Attorney Compensation, stating that though the disclosure marked that the compensation "will not be paid through the plan," the plan listed an amount to be paid through it. Doc. No. 13. The debtor's attorney, Mark Ford, then filed a corrected Disclosure, though he e-filed it as a "missing document" rather than an amended document. Doc. No. 15.

On February 25, 2019, the bankruptcy case was dismissed at confirmation for failure to file required schedules, statements, plan and/or summary, file a feasible plan, income and/or budget statement, make all required pre-confirmation payments to the trustee, provide all required documents to the trustee, and complete business debtor forms. Doc. No. 51. Mr. Ford on behalf of Mr. Hopkins filed a Motion to Vacate Dismissal of Case on March 4, 2019, wherein Mr. Hopkins certified that all the documents requested by the trustee had been sent to her. Doc. No. 55. On April 2, 2019, the court entered an order granting the Motion to Vacate. Doc. No. 58. The Order was served on the debtor and Mr. Ford by the Bankruptcy Noticing Center.

On April 4, 2019, Mr. Ford on behalf of his client filed a Notice of Proposed Private Sale. Doc. No. 59. Mr. Hopkins sought to sell 1371 Oriental Avenue, Gloucester City, New Jersey, to Timothy Savage for $42,000. Mr. Hopkins attached a Contract of Sale that had been executed March 22, 2019. He asked that the broker be paid 3% of the sale price plus $50.

Mr. Ford did not also file a Motion to Sell Property as required by this court's local rules that would include the material terms of the proposed sale. D.N.J. LBR 6004-1(a). Instead, he only filed the Notice of Proposed Private Sale that the local rules require to be filed in addition to the actual Motion to Sell Property. D.N.J. LBR 6004-1(c). Had Mr. Ford filed the Motion, the certification of his client should have explained why he was selling the property for $42,000 when he had estimated on his Schedule A/B that the property was worth $85,000.

On April 23, 2019, the chapter 13 trustee objected to the sale insofar as Mr. Hopkins had not exempted this property, thus she argued that she should receive the $25,315 proceeds after the costs of sale and the $12,484 tax lien on the property was paid. Doc. No. 64. She noted that as Mr. Hopkins' plan had not yet been confirmed, title must be conveyed jointly by the trustee and the debtor. She also pointed out that Mr. Hopkins had not filed an Application to Retain Professional so that his broker could be paid. The chapter 13 trustee's objection was served on both Mr. Ford and Mr. Hopkins. *Id.*

Because of the objection, the clerk's office scheduled a hearing on the sale for May 7, 2019. Mr. Hopkins was served with notice of the hearing. Doc. No. 66. At the hearing, Mr. Ford agreed to submit an order resolving the trustee's objections, including calling for an Application to Retain Broker to be filed. However, he never submitted such an order. Nor, for the relevant portion of this matter, did Mr. Ford file an application to retain the real estate broker.

On June 12, 2019, Mr. Ford on behalf of Mr. Hopkins filed a new Notice of Proposed Private Sale for the same property and, this time, also a Motion to Approve Sale of Real Estate (the "Sale Motion"). Doc. Nos. 78, 79. The purchase price was still $42,000 and the buyer was still Mr. Savage, but an addendum to the sale contract was added stating that that Mr. Savage would now be responsible for the initial removal and testing of an underground storage tank on the property, up to $4,700 in cost. If it cost more to ameliorate, then Mr. Hopkins and Mr. Savage would renegotiate what to do.

Mr. Hopkins' certified that he wanted to sell the property in order to pay off an auto loan. This would be an improper use of the sale proceeds, as the property did not secure the loan.[2]

Mr. Ford later explained that he filed the new Notice of Proposed Private Sale and the Sale Motion because he believed that the first Notice of Proposed Private Sale had been filed prior to the case being dismissed and dismissal vacated. However, he filed the first Notice two days *after* the dismissal was vacated.

On June 13, 2019, PC7, LLC objected to the sale due to the failure of the sale to redeem its tax lien. Doc. No. 80. It had filed a Proof of Claim on January 4, 2019 in the amount of $12,484. The Chapter 13 trustee also objected to the sale, stating that the debtor had not corrected any of the issues raised the first time around. Doc. No. 83.

On July 15, 2019, Mr. Hopkins filed a Supplemental Certification stating that the sale price was now $32,000. Doc. No. 90. He asked that the court approve the sale free and clear. He gave no explanation for why the price had dropped and did not attach a new sale contract.

On July 16, 2019 at the hearing on the Sale Motion, Mr. Ford revealed that the sale had gone to closing on July 1. Doc. No. 104 (transcript). He explained that Mr. Hopkins had told him that the title company had thought that the bankruptcy case had been dismissed. Despite having drafted and filed Mr. Hopkins' Supplemental Certification the day before, Mr. Ford had no explanation for why the sale price had dropped. He stated that the net proceeds were in Mr. Hopkins' bank account. The court instructed Mr. Ford to file a supplemental certification regarding the change in price and confirming that the debtor had turned over proceeds to the trustee.

Mr. Hopkins later testified that the title company had done a "draw down" to confirm that the bankruptcy case was no longer pending. The court does not find this testimony credible. First, while Mr. Hopkins' case had been dismissed and reinstated once, Mr. Hopkins signed a certification to get dismissal vacated, Doc. No. 55-1, and was served with a copy of the order granting his motion to vacate. Doc. No. 61. The case was never dismissed again from that point to July 1, thus there was no reason for Mr. Hopkins to believe that his case was not still pending. He

---

[2] Not that it mattered, but Mr. Hopkins did not even identify which of his two vehicles he wanted to pay off.

also testified to communicating with Mr. Ford via text message several times during the bankruptcy case, and yet he did not double-check the case status with Mr. Ford when the title company allegedly found that the case was no longer pending. Moreover, Mr. Ford did not bring in a witness from the title company, or minimally submit a certification from it, to support Mr. Hopkins' assertion.

Additionally, Mr. Hopkins did not behave as if his case was not pending. Mr. Hopkins made trustee payments in April, May and June 2019, after the case had been reinstated. Most damning, he informed Mr. Ford on July 3 that the sale had closed. Mr. Ford was not acting as Mr. Hopkins' real estate attorney. There would be no reason to alert Mr. Ford to the closing if the bankruptcy case was not active.

As for Mr. Ford, after finding out about the closing, Mr. Ford did not immediately inform the court and/or the trustee. Instead, the day before the hearing on the Sale Motion, he filed the Supplemental Certification where Mr. Hopkins stated that the sale price was now $32,000 and asked for the sale to be approved. He did this knowing that the sale had already taken place, yet he did not ask that approval be granted *nunc pro tunc* or seek the court's forgiveness that his client had gone ahead with closing. It was as though he did not understand that his client had done something very wrong. That despite learning of the closing on July 3, Mr. Ford did not immediately instruct Mr. Hopkins to turnover the proceeds to the chapter 13 trustee, or at least not to spend any of the proceeds, supports this conclusion. According to the chapter 13 trustee, Mr. Ford even later forwarded the quit claim deed to her, asking her to add her name to the grantee, despite that she could not do so because the sale had not been approved.

At a hearing held July 23, 2019, Mr. Ford reported that the night before, Mr. Hopkins had given him an $11,000 check, representing the remaining proceeds, payable to Mr. Ford, to be transferred to the chapter 13 trustee. *See* Doc. No. 105 (transcript). Mr. Hopkins later testified that he had been making his trustee payments to Mr. Ford because he had had difficulty setting his computer up to make payments through the trustee's online ePay system. This does not explain why he could not obtain a certified check to the trustee to pay over the sale proceeds or why Mr. Ford did not instruct him to do so.

Mr. Ford also reported that Mr. Hopkins had spent the rest of the proceeds on various bills. While Mr. Ford reiterated that Mr. Hopkins told him that the title company thought the case had been dismissed, the trustee reiterated that the property had not been conveyed properly, no broker retention application had been filed, there still were no details on the price change, the sale proceeds had not been turned over, and no HUD-1 had been filed. The court instructed Mr. Ford that a "thorough certification" was necessary.

On July 29, 2019, Mr. Hopkins filed a Supplemental Certification attaching the HUD-1, and another Supplemental Certification listing how he spent the some of the proceeds and attached an email chain evidencing the reason for the price decrease, as well as the deed from Mr. Hopkins to Savage Homes, LLC dated July 1, 2019. Doc. Nos. 95, 96. Mr. Hopkins stated that he spent the proceeds as follows:

- Insurance, $388

- Mortgage, $3,374
- Cable, $250
- Chapter 13 trustee, $1,800 (May, June, July)
- Loan to business, $600
- Utilities, $566
- Mark Ford, $11,000
- Mark Ford, $700
- Various (auto repairs, food, store, medicine), $793

Doc. No. 96. The email chain was mostly between the brokers for Mr. Hopkins and Mr. Savage, negotiating the price down because Mr. Savage determined that the underground oil tank had leaked. Mr. Hopkins' certification did not explain why the price had started at $42,000 rather than his estimated value of $85,000. He later testified that the $42,000 number was merely the offer that Mr. Savage made, and Mr. Hopkins accepted.

Mr. Ford also filed a certification. Doc. No. 97. In support of his client's contention that the title company had thought the case was dismissed, Mr. Ford related how the case had been marked for dismissal on February 13, 2019 with a 10-day hold, but Mr. Hopkins had supplied the paperwork and the case was not dismissed. However, as related above, the case in fact *was* dismissed on February 25, 2019. Mr. Ford filed a Motion to Vacate on March 4, 2019, that was granted on April 2, 2019. *See* Doc. Nos. 51, 55, 58. The case had been dismissed for failure to:

- file required schedules, statements, plan and/or summary
- file a feasible plan, income and/or budget statement
- make all required pre-confirmation payments to the Trustee
- provide all required documents to the Trustee
- complete business debtor forms

Doc. No. 51. Thus, it was more than just a failure to provide some documents.

Mr. Ford further stated that on February 7, 2019, he had texted Mr. Hopkins that he should hold the sale proceeds for the trustee pending confirmation. However, he did not attach a copy of that text. In addition, this alleged text was sent two months before the first Notice of Proposed Private Sale was filed on April 4, and even before the contract was entered into on March 22. Thus, even if Mr. Ford did send such a text, which is difficult to believe, he did so in a manner and at a time that it was unlikely that his client would take heed.

Mr. Ford also stated that in early June, Mr. Hopkins told him that the sale was postponed due to the oil tank issue, and Mr. Ford noted that the sale approval motion needed to be re-listed. But as related above, dismissal was vacated on April 2, two days prior to when the first Notice of Proposed Private Sale was filed on April 4. On May 7, the sale motion was marked "order to be submitted," but Mr. Ford never filed an order. He filed a new Notice on June 12 with a July 16 hearing, not correcting any of the issues objected to. This all could have been gleaned from the docket entries, which Mr. Ford seemingly did not consult.

Finally, Mr. Ford certified that on July 3, Mr. Hopkins told him that the sale had closed July 1. Mr. Ford told him on July 16 to pay over the proceeds to the trustee. Thus, Mr. Ford only told Mr. Hopkins to pay over the proceeds after the court ordered him to. He did not on July 3 instruct his client to not dissipate the funds, nor did he file a new motion to approve the sale *nunc pro tunc*.

The chapter 13 trustee responded to these filings on August 22, 2019, stating again that the deed is defective without her joint conveyance and that a corrective deed was needed. Doc. No. 100. She advised the court that Mr. Ford instead had sent her the deed asking that she execute it and return it to him, despite that the sale still lacked court approval. The trustee objected to Mr. Hopkins' statement that he made a mortgage payment with the proceeds as a mortgagee had filed a Motion for Relief in the case alleging that no payments had been made during the case, and Mr. Hopkins opposed the motion only on the grounds that he had listed the property for sale. She also complained that Mr. Hopkins had paid Mr. Ford $700 when Mr. Ford's services should have been included within his flat fee.

Mr. Hopkins filed a response stating that the mortgage payment was made for a different property. Doc. No. 101. Mr. Ford filed this response for his client even though Mr. Hopkins did not specify what property, and his Amended Schedule J showed no mortgage payments. *See* Doc. Nos. 22, 47. Mr. Hopkins later testified that the mortgage payment was on his late mother's property.

Mr. Ford stated at a September 3, 2019 hearing that Mr. Hopkins paid him $400, not $700. Doc. No. 106 (transcript). Mr. Ford admitted that he had drafted the certification that stated the payment was $700.

At that point the court stated that it would consider any disciplinary actions against Mr. Ford and whether to dismiss case with prejudice for the bad faith of the debtor.

The chapter 13 trustee proposed the following remedies:

1. Mark Ford, Esquire, receive no additional fees in this case. He sought $4,097 to be paid through the plan. To date, the Trustee has disbursed the sum of $1,652.40 to Mr. Ford. He should be required to forfeit the $2,444.60 balance outstanding due to his inadequate representation in this case.

2. The plan should be modified to include:

• Administrative fees due City of Gloucester and PC7, LLC in the amount of $900.00;
• Payment to Wells Fargo in the amount of $3,631.51 for the debt secured by a 2008 Nissan Quest in accordance with claim #8;
• Nissan Acceptance Corp. accepts the cram down amount of $11,400 in full satisfaction of its claim in the amount of $19,216.50 (claim #2);

- Select Portfolio Services for arrears in the amount of $28,580.07 to be satisfied in full from real estate closing on 821 Hudson Street, to take place on or before November 11, 2019 per order entered by this Court on October 2, 2019;[3]
- That any non-exempt funds from closing of 821 Hudson be submitted to Trustee for payment of the remaining balance due under the plan;
- Payment to City of Gloucester for utilities on 403 Filmore Street, Gloucester City, NJ, in the amount of $1,687.15 per the January 9, 2019 secured claim (claim #12);
- Payment of 100% of timely filed claims in the amount of $4,878.78[4] with interest at 5% for a total of $5,122.72;
- Immediate payment of bankruptcy plan arrears in the amount of $2,000; and
- A two-year bar to future filings.

Doc. No. 116. The trustee also stated that she was holding $13,958.79. Mr. Hopkins would need to make monthly payments of $600 for 16 more months to pay the proposed plan in full.

Mr. Ford replied on October 25, 2019. Doc. No. 119. Regarding modifications to the chapter 13 plan, Mr. Ford stated that Gloucester City had already been paid and referenced an "attached payment" that was, which seems par for the course, not attached. He also explained that 821 Hudson Street had been "incorporated into an amended plan," as had the administrative fees. One creditor with a security interest in a vehicle, whose claim Mr. Hopkins proposed to cram down, had been served (but as of this writing, Mr. Ford has not filed either a Certificate of Service of this plan or a Notice of Chapter 13 Plan Transmittal, the latter required when the debtor's plan affects a lienholder. D.N.J. LBR 3015-2), and another vehicle lienholder would now be paid through the plan. Mr. Hopkins had sent the trustee $400 and was attempting to pay the additional $1,600 in plan arrears.

Regarding his fees, while Mr. Ford "acknowledge[d] that his representation has at times been inadequate" he argued that "even the standard fees requested will not [be] adequate compensation for the extensive amount of work done and this [sic] will be required to be done in this case." Doc. No. 119. He pointed out that there will likely be filed another motion to approve sale of another property, that the debtor has legal or equitable interest in several properties plus his late mother's estate, and the debtor is self-employed, which required much paperwork to the trustee. On October 29, 2019, Mr. Ford did file a Notice of Proposed Private Sale of 403 N. Filmore Street, Gloucester City, New Jersey, and a Motion to Approve Private Sale. Doc. Nos. 120, 121.[5]

---

[3] As of November 5, 2019, no Motion to Approve Sale has been filed for this property. But on October 25, 2019, Mr. Ford filed an amended Chapter 13 plan that indicates that the debtor intends instead to get a loan modification in connection with the property, by November 11, 2019. Doc. No. 118. This conflicts with the terms of the Order Resolving Motion for Relief from Stay entered October 2, 2019. Doc. No. 111. In addition, in his prior plan, the debtor had proposed a loan modification with a completion date of February 2020. Doc. No. 93. The amended plan did not note the completion date change.

[4] The court calculates the sum of unsecured claims as $4,869.78.

[5] Not surprisingly, there Mr. Ford uploaded the wrong document as the Certificate of Service, and though he has filed other documents since, he has not corrected this error. The proposed order for the sale does not specify that the balance of proceeds would be paid to the trustee. The debtor's certification does not explain why the sale price is $35,000 when the tax assessed value is $48,500 (in an objection, the trustee avers that the listing price was $49,900). The certification also neglects to recognize that since no plan has been confirmed—and just as with 1371 Oriental

Meanwhile Mr. Hopkins, Mr. Ford reported, agreed to 100% payment of unsecured creditors but not with interest, and objected to the two-year ban on re-filing. But Mr. Ford merely stated these objections rather than argue why the trustee's proposals should not be followed by the court.

## DISCUSSION

As previously determined by the court at the last hearing, Mr. Ford's and Mr. Hopkins' pleadings and arguments, egregious conduct, and complete lack of attention to details reflect an abuse of, and blatant disregard for, the bankruptcy system indicating bad faith and warranting sanctions. Moreover, the court is satisfied that Mr. Ford and Mr. Hopkins were provided with due process with regard to an imposition of sanctions. "Notice is sufficient if the responding party is aware that he or she is being charged with bad faith conduct and needs to confront this charge to defend against the imposition of sanctions." *In re Theokary*, 468 B.R. 729, 748 (Bankr. E.D. Pa. 2012), *aff'd sub nom. Theokary v. Shay*, No. CIV.A. 10-0058, 2013 WL 5823849 (E.D. Pa. Oct. 29, 2013), *aff'd sub nom. In re Theokary*, 592 F. App'x 102 (3d Cir. 2015). During the hearing, Mr. Ford and Mr. Hopkins were put on notice that the court would consider the appropriate sanctions, and they were given the opportunity to respond before the imposition of sanctions. They responded, however, despite their response, the court finds that sanctions are appropriate here.

Section 105 provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C.A. § 105(a) (West).

The Supreme Court has stated that "even if § 105(a) had not been enacted," every federal court has an "inherent power . . . to sanction 'abusive litigation practices' . . . ." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 375–76 (2007).

Such [sanction] orders are necessary "'to protect the integrity of the Bankruptcy Code as well as the judicial process,'" and to enable bankruptcy courts to maintain

---

Avenue—the deed must be transferred by the debtor and the trustee. Mr. Hopkins certifies that "The sale of this property is necessary to make the Chapter 13 Plan work." But his latest-filed chapter 13 plan (Doc. No. 118) does not include sale of this property. The certification also states that "I would have to pay one judgment that is on the property," but does not specify what that judgment is or the amount. Mr. Ford filed an Application for Retention of Professional on November 4, 2019, but it is in connection with the sale of 1371 Oriental Avenue, not this property.

Thus, even with the threat of sanctions looming over him, Mr. Ford has failed to correct prior mistakes and pay attention to details.

order and control over the cases before them. [*In re Antonelli*, 2012 WL 280722, at *13 (Bankr. D.N.J. 2012)], (quoting *In re Arkansas Communities, Inc.*, 827 F.2d 1219, 1222 (8th Cir. 1987)).

*In re Schemelia*, 19-15830 (JNP), 2019 WL 4690912, at *5 (Bankr. D.N.J. Sept. 25, 2019).

"Sanctions pursuant to section 105(a) include monetary damages, as well as 'other relief as necessary and appropriate to prevent such abuse.'" *In re Suh*, 17-17221-ABA, 2018 WL 2113092, at *9 (Bankr. D.N.J. May 4, 2018) (quoting *In re Santana*, 12–36802/JHW, 2013 WL 1498278, at *3 (Bankr. D.N.J. Apr. 10, 2013)). "In determining an appropriate sanction, the court should consider the goals of 'compensation to the injured party, punishment and deterrence.' *In re A.H Robins Co., Inc.*, 133 F.3d 913 (4th Cir. 1998). The sanction 'should be tailored to fit the particular wrong.' *Topalian v. Ehrman*, 3 F.3d 931, 936 (5th Cir. 1993)." *In Re Glob. Prot. USA, Inc.*, 546 B.R. 586, 631 (Bankr. D.N.J. 2016).

### Mr. Hopkins

It is clear to the court that Mr. Hopkins knew that his bankruptcy was pending when he closed on the sale of Oriental Avenue. He had signed a Motion to Vacate the only dismissal of his case and then received a copy of the Order Granting the Motion to Vacate, had been making trustee payments since the case was reinstated, and advised his bankruptcy attorney within two days that the sale had closed. In addition, he knew that prior court approval of the sale was necessary because he had signed a certification in support of approval of the Sale Motion. He allowed the unauthorized sale to move forward, wrongfully utilized the proceeds to make unauthorized disbursements, and initially pocketed the proceeds into his own bank account.[6] His bad faith conduct cannot be ignored by this court. What has transpired reeks of an abuse of the bankruptcy process. There are statutes and rules put in place to ensure the integrity of the system and to protect debtors and creditors alike. We cannot have debtors ignoring the process and taking actions contrary to the statutes and rules put in place. We also cannot reward a debtor who has abused the process solely for his own benefit by allowing him to reap the benefits afforded by the system. Sanctions are warranted against Mr. Hopkins.

When it comes to sanctions, however, quite frankly the court was unsure what to do. Dismissal of the case, normally "a sanction of last, not first, resort," *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d at 869, would mean that Mr. Hopkins' unsecured creditors, who have been stayed from collecting on their claims during this case, would then have to chase him for payment. And granting a discharge might only hurt creditors – especially those unaware of his case or whose secured claims are being crammed down under his plan. Finally, the court agrees with the trustee that attempting to reverse the sale and disgorge payments made is too costly and time-consuming. A suit against the title company is not necessary considering that the unsecured creditor pool is small.

---

[6] The court had to direct Mr. Hopkins, through Mr. Ford at the initial hearing on this matter, to immediately provide the remaining proceeds to the chapter 13 trustee. Doc. No. 104, p.4, ll. 3–16. Even then, he paid the proceeds to Mr. Ford instead of directly to the chapter 13 trustee as directed. Doc. No. 96.

On the other hand, adopting the trustee's idea to continue the plan for 16 more months would give Mr. Hopkins the benefit of a $7,736.50 cramdown of his vehicle, despite that he has the funds to pay his creditors in full. In addition, since Mr. Hopkins has another sale on the horizon of property that seemingly is unencumbered, he could pay the plan off early and keep a surplus of the sale proceeds. But it simply does not seem equitable to this court to allow Mr. Hopkins to continue with his plan which provides for cram down of secured claims when he has acted in bad faith and also, the court does not have confidence that Mr. Hopkins will abide by his plan obligations.

At the hearing on September 3, 2019, the court made it clear that any resolution of the matter would require a 100% plan and perhaps even interest would be appropriate. Mr. Hopkins does not agree with the trustee's suggestions and proposes no acceptable alternative. The court is not convinced Mr. Hopkins will comply with any plan obligations or that he appreciates the severity of his bad conduct. Therefore, it determines that the appropriate sanction is to enter an order directing the trustee to use the funds on hand to pay the unsecured creditors with timely filed claims in full. As accrued interest is inconsequential, the court does not require it to be paid. The trustee shall be entitled to collect her commission on this amount. This will pay all of Mr. Hopkins' unsecured creditors in full and allow the trustee to collect a commission in a case that, because of the problems of Mr. Hopkins and Mr. Ford, required more work of her than usual, and the unsecured creditors should not suffer because of Mr. Hopkins' bad faith conduct. Any surplus will be returned to Mr. Hopkins for him to deal with his secured creditors on his own. Since secured creditors have their collateral to protect them, the court finds its sanctions appropriate. As will be explained below, the trustee will not pay Mr. Ford the remainder of his attorney fees.

The court will then dismiss this case with a two-year bar to re-filing. The court believes that forcing Mr. Hopkins to pay the unsecured claims coupled with the two-year bar against future filings, appropriately sanctions Mr. Hopkins' abuse of process that was beyond compare while also defending the integrity of this court. Rather than allowing a plan confirmation, dismissal withholds the benefit of the vehicle cramdown to someone not willing to abide by the burdens bankruptcy also puts on a debtor. Besides, dismissal avoids the problem of having to set aside an unauthorized sale that took place back in July and also the need to reissue a corrected deed issued by the chapter 13 trustee in order to validate the sale. No further efforts need to be exhausted due to the debtor's conduct.

Mr. Ford

In conjunction with its power under section 105(a) and inherent power to impose sanctions, the court is mindful that, in approving an attorney's fees, it would consider that:

> Under § 330(a) of the Code, bankruptcy courts *may* award reasonable compensation for actual, necessary services rendered by the attorney and by paraprofessionals employed by the attorney, the reasonableness to be based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases.

*In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 840 (3d Cir. 1994).

> The bankruptcy court maintains independent authority and responsibility to review fee applications for the reasonableness of compensation. *In re Busy Beaver Bldg. Ctrs. Inc.*, 19 F.3d 833, 842–43 (3d Cir. 1994); *see also Comm. of Eq. Sec. Holders v. Off. Comm. of Unsecured Creditors (In re Federal Mogul–Global, Inc.)*, 348 F.3d 390, 396–97 (3d Cir. 2003). Reasonableness of compensation should be considered in light of the tangible benefits the fee applicant has conferred upon the estate as well as the creditors, determination for which is left to the sound discretion of the court. *See* 11 U.S.C. § 330(a)(2) & (3); *In re Int'l Coins & Currency, Inc.*, 23 B.R. 814, 816 (Bankr.D.Vt.1982) (citation omitted); *In re Zenith Labs., Inc.*, 119 B.R. 51, 54 (Bankr. D.N.J. 1990). The fee applicant maintains the burden of proving that "it has earned the fees it requests, and that the fees are reasonable." *Zolfo, Cooper & Co. v. Sunbeam–Oster Co.*, 50 F.3d 253, 261 (3d Cir. 1995) (citation omitted).

*In re McDermott*, 05-17387(DHS), 2009 WL 2905375, at *6 (Bankr. D.N.J. Aug. 24, 2009).

Mr. Ford argued that his attorney fees should not be cut because he did considerable work in this case that even the negotiated flat fee will not cover. The court disagrees. First, the chapter 13 plan filed at the inception of this case anticipated selling the Oriental Avenue property, thus the work in connection with that was incorporated into Mr. Ford's flat fee. Mr. Ford filed a second Notice of Proposed Private Sale only because he never submitted an order after the first one was heard. The second Notice of Proposed Private Sale did not correct any of the trustee's objections to the first, including retaining the broker so that the broker's commission could be paid, even though Mr. Ford had agreed at the hearing on the first Notice that he would correct his proposed order in light of the trustee's objections. The certifications in connection with the Sale Motion were deficient in not explaining why the sale price was less than half of the value Mr. Hopkins had disclosed on Schedule A/B. Mr. Ford allowed Mr. Hopkins to certify that he would improperly use the sale proceeds to pay off a vehicle. Mr. Ford filed on behalf of Mr. Hopkins a certification that stated without any explanation that the sale price had dropped to $32,000. When Mr. Ford learned that the sale had closed without court approval, he did not immediately tell his client not to spend any of the sale proceeds. He also was content to wait until the hearing on the Motion to Approve to inform the court and the chapter 13 trustee. Even then, he did not provide documents such as the HUD-1 to the trustee. He relied on his client's statement that the title company thought that the bankruptcy case had been dismissed rather than get a certification from the title company. Mr. Ford asked the trustee to sign the quit claim deed despite that the court still had not approved the sale. All of this is severely substandard representation, even without looking at errors outside of the Sale Motion debacle.

While there were many other attorney errors committed within this case—a Pre-Confirmation Certification of Compliance with Post Petition Obligations filed when the debtor was not current in trustee payments; a Schedule D disclosing secured creditors without identifying what collateral they were secured by; multiple plans filed indicating that no secured claims were

being crammed down when the debtor was cramming down Nissan (Doc. Nos. 39,[7] 71, 93, 118)—the court will highlight those in connection with Schedule C, where Mr. Ford elected exemptions for his client that greatly exceeded the amounts allowable under those sections:[8]

- The section 522(d)(1) exemption exceeded the $23,675 available by $86,325.
- The section 522(d)(3) exemptions in the amounts of $1,000 each exceeded the $600 cap in value in any particular item.
- The section 522(d)(5) exemption of the interest in the Hopkins Estate exceeded the $1,250 available (the 522(d)(1) exemption having been fully used) by $54,750.
- The section 522(d)(7) exemption in the Hopkins Tax Service did not make any sense since (d)(7) concerns unmatured life insurance contracts.

On May 24, 2019, Mr. Ford filed an Amended Schedule C to exempt "various electronics" in the amount of $700 under section 522(d)(3). Doc. No. 72. This again exceeded the $600 cap in value in any particular item.

After the trustee objected to the section 522(d)(1) and (5) exemptions, Doc. No. 84, Mr. Ford merely shifted the property exempted under (d)(5) to a (d)(1) exemption that was already over its limit. Doc. No. 85. When the trustee again objected, Doc. No. 89, Mr. Ford did not respond.

"Exemptions are one of the most important issues for individual consumer bankruptcy debtors. All debtors' attorneys should be well-versed in the various choices debtors may have in selecting state or federal exemptions." *In re OBrien*, 443 B.R. 117, 144 (Bankr. W.D. Mich. 2011). "Certainly, when a client retains a bankruptcy attorney to help them file bankruptcy, it is the role of the attorney, using his or her expertise, to claim exemptions for the client on the bankruptcy Schedule C." *In re Redington*, 16-18407-ABA, 2018 WL 6444387, at *5 (Bankr. D.N.J. Dec. 6, 2018) (footnote omitted). Applying the correct exemptions is a fundamental job of a debtor's attorney. Here instead it appeared that Mr. Ford did not even consult the Bankruptcy Code to determine the limits of the exemptions and/or the basis for the trustee's objection, as his "correction" did nothing to solve the issue.

The errors and omissions made in the several chapter 13 plans and Schedules are too laborious for the court to recount and unnecessary, as it is clear to the court that Mr. Ford's representation of Mr. Hopkins was gravely lacking. The trustee is being generous in not asking Mr. Ford to disgorge what he has already been paid. *See* 11 U.S.C. § 329(b)(2) (providing for return of fees that exceed the reasonable value of services). The court will enter an order disallowing the remainder of Mr. Ford's fees.

---

[7] This plan was specifically modified to cram down Nissan. Yet the debtor checked "does not" on page one regarding whether the plan included any cramdowns. Mr. Ford never filed a Motion to Modify claim in conjunction with this cramdown, despite the bold instruction on the court's form plan that states "A modification under this Section ALSO REQUIRES the appropriate motion to be filed under Section 7 of the Plan."

[8] Mr. Ford's position that he earned his fees in this case opens the court to examine all actions taken in the case, not just those in connection with the sale of 1371 Oriental Avenue.

## CONCLUSION

Accordingly, an order directing the trustee to pay the allowed, unsecured claims and her commission will be entered, after which the case will be dismissed with a two-year ban to refiling. The court will also enter an order disallowing the remainder of Mr. Ford's fees.

The court reserves the right to revise its findings of fact and conclusions of law.


/s/ Andrew B. Altenburg, Jr.
United States Bankruptcy Judge

Dated: November 19, 2019